We have police in the court in the Cal Potter District. Adam, on behalf of Denise Abbey, who is also present, on behalf of Rory, son of Micah Abbey, who is deceased. Knowing that the court is familiar with the facts of this case, I would like to focus on why the District Court erred in failing to apply the subject of the case for the Queen's Circuit. Drummond v. Anaheim, in that the District Court failed to look and break down the use of force that occurred in this particular matter from the time in which Mr. Abbey was handcuffed. Which was dealing with the first phase, which may or may not have been constitutional, but because there was a defensive use at that point in time, the court was able to look at those particular facts, but the court failed to then look to the facts after the handcuffing had taken place. The handcuffing took place after Mr. Abbey said, I give up. And as a result of that, they were able to... Can I stop you for just a minute? Yes, sir. It seemed to me, from the factual development, that even after Micah Abbey was handcuffed, he was still resisting and still fighting them. Is that not the way the facts point? That is true in part, but it doesn't take it out of the hand of Drummond, because what happened here was once he is handcuffed, he's in a prone position, which is critical here. Once the court failed to look at, these officers were never trained in octine. The dangers, they were never trained in excited delirium. They were never trained in the octine resulting in this will fix you. Those are the factors that are brought forward in the Drummond and the progeny cases that come out of Drummond. So in this particular instance, because he was left in a prone position, they recognized that they became winded themselves, but it's not a serious threat at that point. We go back and look at Graham versus Potter's factors that once he's handcuffed, it is not a serious threat at that point in time. Was he handcuffed behind his back at that point also? He was. He was handcuffed behind his back. More importantly, he was then placed in a prone position, and Officer Peitsch is the individual that's on his shoulders area, and then Officer Quad is on his lower back, continuing to tase him. So the tasing is after he is handcuffed. They're trying to extend tasing. So the situation that all of this is doing is creating more delirious, delirium or deliriousness on the part of Mike and Abby. So in terms of looking at what their reactions were after that point in time, an officer from UMR, a university officer, shows a stick-your-fore-type hold, and once again, he isn't a serious threat at that point in time. But it doesn't stop at that point in time, because what comes forth is the fourth officer, Officer Rasmus, and Officer Rasmus, in that particular instance, hogties and closes the ripper shapes around his ankles and up through the hip. So he's literally a hand hogtied at that point in time. Now the officers can be looked at in terms of their action as being objectively reasonable, based upon the City of Reno's failure to train their officers appropriately. And what our expert at UDVM, Dan Barakam, states is that in fact, all of this has been known and valued as its own center to prevent incastity deaths. It deals with these factors. Excited delirium also deals with the factors of when the taser should be used for what purposes. So in this particular instance, these officers, in making their determinations, were on a crash course that ultimately took the life of Mr. Abbey. And the reason they were on that crash course is because they weren't properly trained to recognize that after you've handcuffed an individual, after he is no longer a serious threat, he has to be turned over. They could have accomplished the same thing by sitting on his ankles on the front, but the critical point is that he's turned over in an upright, pragmatic curve. And in this particular instance, the Medical Examiner for Washoe County even determined that the death was the result of the restraint, whether it was based upon the matter of needs that were utilized, the determination was not submitted by the hands of the police officers. Mr. Abbey was no longer a threat. That's what all of the case law in the circuit talks about, focusing it upon the determination of whether he is a serious threat. Okay, so if an individual is being held and nevertheless continues to resist, is it your position that nevertheless that person is no longer a threat? No, he's no longer a threat in the sense that it's when you have additional officers that are on your necks. That's why you have to look to the facts of the training in this particular instance. What's critical is once you have him handcuffed, that you get him set up right and you have him, he has the ability to breathe. Can he do that if he's resisting? You can if you're dealing with his ankles. I think there was a case that came through here. Tucker versus Metro was the same type of facts that dealt with even the chasing. Our expert looked at the RC case, the same kind of arguments. When you have that number of officers involved, you pick the split here, you add four officers involved, then he isn't a serious threat. He stops at that point in time. Because they didn't talk to him. But you can hold an individual down and still do the proper procedures according to law enforcement 101. You turn that individual up. The arguments that have been made in this particular case is the officer self-serving statements should not be accepted as the end of the line. What the court has done here in the past is looked at what would occur in a trial setting if an individual is not a serious threat. Going back to the fact that he's emotionally and mentally distressed, sweating profusely. He may have incredible strength is one of the things that they also look at in making these determinations. But that in and of itself does not mean that their actions are objectively reasonable under the facts of this particular case. He was unarmed initially. He wasn't in a situation that he was a danger to anyone at that particular point in time. If you're sitting in this case. Sorry. Well, I'm sorry that you haven't. We're dealing with immunity. And just our law contained a bright line rule like the one that you were advocating for when you were dealing with someone who has been violent. And who has been handcuffed and continues to arrest and resist. Is there some bright line rule that says please have to stop him? No, there's not a bright line rule, but there has to be an acknowledgement on the part of the officers that they're in a perilous situation dealing with an individual that is suffering from anxiety and delirium. Because they weren't trained in that. They were on a crash course to kill this individual. And I think what's important is what the court looked at. They were trained in discriminating whether or not the conduct is objectively reasonable in light of the established law. I think you have to look at the training in this particular instance because there was no training in tough tales and free hugs out here. Also, their actions were not reasonable. If you look at the cases out of Phoenix, the Marquez case, we relied upon that individual was not in a situation where they were handcuffed. They were unhandcuffed. If you look at the Tatum case that the district court looked at, once again, that was a situation where an individual was unhandcuffed. So what I'm arguing to the court is by well settled law of the Ninth Circuit, that is where they normally look at it. It's not a serious threat once it's been handcuffed. And so the objective from reasonableness that then goes into play is the fact that these officers were never trained to recognize any of these factors. They were never trained on the issue of system fixing. We're excited and delirious. So by definition, I think you do have to look not only to the case law, which is clearly well settled. Well, aren't those cases your authority for saying that and determining not the liability of the city, but the liability of the police officers that we look to the training? Well, I think the Orley v. Smith case where the officers weren't aware of the fact that a bean bag could easily fall out with them is another indication. It's happening under those circumstances. Now, why don't they know those types of facts? They weren't properly trained. So it isn't a bright-line rule, I don't believe so, Your Honor. But I know you sat on that in the Orley case. And I think what's important is that you look at all of these factors. Yes, and you look to all of these factors to make the determination that Marquez, he was not handcuffed. And so the district court in Nevada looked at that and said, Well, just the mere fact that you're tasing an individual is not sufficient under the case law. But that isn't correct, Your Honor. When you look to the totality of these facts, you're looking at what these officers were doing. And that's what occurred in terms of the trauma. The individual was handcuffed. They placed the bodies of the officers on top of him. And it ended up arguably not only the fracture, but in terms of the situation where he received brain damage as a result of the position fixing. So what happened after the hog tying? I know it sounds like you're relying on the handcuffing and the tasing. But did anything happen after he was hog tied? No, it did not. And other than the fact that at that point in time, if he had been sent up to the hog tie, he would have been in a situation where he clearly would have had an opportunity for recovery. And that's the testimony of the medical experts. The court has an objection. Dr. Reserves. Good morning, Your Honors. Good morning. Let me please the court. My name is Mark Donegan, and it is my honor to be here today representing the city of Reno. Respectfully, Your Honors, but especially with due respect to a mother who lost her son, the inquiry before the district court and now before this court is a narrow one. And I know that the judges are familiar with the concept of qualified immunity before I address point for point what my adversary has raised. I'd like to talk a little bit about the policy of qualified immunity. Now, the policy is to protect law enforcement officers from suit, not just the assessment of damages, but from the burdens of litigation. And it's supposed to protect all but those lamely incompetent and those who knowingly violate the law. And the law does this because we recognize that law enforcement officers make difficult, split second decisions in tense and escalating and evolving circumstances. And so we don't second guess these decisions that law enforcement officers make day in and day out. We do second guess them if they result from excessive force or more force than was necessary to contain the situation. In the long run, I wanted to ask you if you agree with the policy council that the deceased did not compose any dredge once he was handcuffed. No, the city of Vietnam disagrees with that. In fact, I'll read directly from testimony in the House of Electors. That's the point. I don't think there is a very fine rule that at the end of an assessment act offers no additional threat. This is from the records from Officer Bond's testimony. Now, this is after he's gotten his teaser to work and he drives Stone to Mikey Abbey and his home on the back. And that's when the teaser finally works and Mikey Abbey says, I give up, and he allowed himself to be cuffed. And then he immediately resumed the fight. And so what Officer Bond says is, every time he would lift me off the ground, Officer Bond is sitting on the back of his knees and thighs. Every time he would lift me off the ground, he told him to put me down and stop fighting and drive Stone for about a second, not a whole cycle, in the back of the right thigh. In another description of that same circumstance, he's lifting me all the way off the ground and I'm throwing me off. And he drives Stone in the back of the right thigh every time he lifts me up. Every time I'm trying to get my legs under him to walk my legs because he's trying to throw me off him. It's all I can do to balance and stay on. Does the record indicate how much heavy weight? It probably does, Your Honor. I shouldn't tell you from recollection. I would also point out that this is an individual who both announced before the officers on the ground began saying that there was going to be a fight if they tried to take him. And the home supervisor, of course, wanted Mikey to rest and he wanted him to learn that there were consequences for his actions. The officers didn't want to take Mikey to jail. They wanted to take him to the hospital, but he did not want to go voluntarily. He said there's going to be a fight. He jumped on his bed and he tried to jump through a window. Not out the window, but through the glass window. He bounced off the window. At that point, Your Honors, the officers have no choice but to go hands-on. And with regard to the self-serving testimony of the police officers, that's not a generic decision. What that decision goes on to say is that what the courts do is look at the circumstantial evidence, if any, that seems to discredit the testimony of the police officers and consider whether that evidence could be a rational fact matter to conclude that the force was excessive. The appellate hasn't pointed to any circumstantial evidence in this case that undermines the officers. There's simply an assertion that the force was excessive. There's an assertion that there's discrepancies, omissions in the testimony. With regard to client's look at circumstantial evidence, I would point to the fact that Mike Abbey, his toxicology show that he was on a drug and he had admitted to his therapist making psychotic, and then they decided to safety plan, saying we're not going to do that drug anymore. I would point to the circumstantial evidence that he just committed a violent crime and threatened someone with a fork, that he threatened everyone that he left with, so that he, I believe that the language that he said was that he was going to end everybody up. Absolutely. Let me just, you know, my issue in this case or the thing that I struggle with is the hog tying, because I think historically hog tying someone, having them lay prone, and then it seemed like there was a little bit of a factual issue about how much of the officers were on Mr. Abbey's back or his shoulders, but don't you agree that there's been some criticism of that kind of a procedure in terms of hog tying and police officers getting on a person's body when they're down like that? There is some criticism of it, Your Honor, and I would point out a couple things. One is that the medical evidence in this case doesn't indicate that Mike Abbey died of asphyxiation. It doesn't indicate that there was a appreciable way to place him on his back. Now, G.P. Flayman-Plaracombe, New Paltz Police Practices expert, opined that and appellate managers' work in terms of asphyxiation is appreciating a lot, but in fact the autopsy doesn't contain word of asphyxia. Now, with respect to authority on employees, I should say that cardiopulmonary arrests, this is a complicating, excited delirium, I believe, Your Honor. No? If the manner of death was homicide, doesn't that indicate that something much more was done? I think the definition of homicide, Your Honor, is that it's a death that's caused by an interaction with a person. I don't believe that that's positive in this case. I don't think you talk about authority on hog tying. Well, it's different than as an accidental, for sure, because oftentimes you don't say the manner of death is accidental or negligence, but the fact that homicide is in there does portend something, don't you think? I would just say that that's a medical iceberg. Using the term, I don't think it's meant in a legal way. As I may, I'll talk to you, Your Honors, the Price case out of San Diego. This is a district court case. This is the case where a gentleman fought deputies after he was pulled over and they pinned him down on a pavement and they hog tied him. And what the district court said in that case is that a hog tie is not, per se, an excessive force if the subject has resisted by severe means of restraint. And, in fact, while that's not binding authority, that case was looked at in the Drummond case that a client relies on. And Drummond distinguishes violent, resistant subjects from ones that are compliant, as I think Drummond was. And both the Price case and the Estada Phillips case did not find excessive force where a person was held down on a beach. He's not then resisting. The reason that we are in the district court, Your Honor, is quite methodical. In qualified immunity analysis, it goes through the type and amount of force used. I don't think there's any dispute of fact as to measure the intrusion on Mike and Abby's rights. It balances that against the graham factors, the severity of the underlying crime, which in this case was a violent, threatening crime. Did the district court address the hog tying point? I think the court just said that it was deemed to be reasonable under the circumstances that the measures used were all approved by themselves. That's the same just as their standards of training as well as my department's policies. I'm just wondering if the hog tying part was addressed specifically. Certainly the court references what law enforcement code represents. It finds that the use was subjectively reasonable, Your Honor. And can you say the alphabet is the hog tying? Yes, Your Honor. Now, if I can answer the court's question about the training of the officers. I think the Sheehan case, the Supreme Court said that in a qualified immunity analysis, you don't look at the training. What you're looking at is whether the force was excessive and whether it was so clearly established that a reasonable officer would have known that he was breaking the law by committing the conduct. I'll select a summation that Drummond, as I said, is inadequate because Drummond had committed no crime. Drummond's family called the police to take him into custody to protect him from himself. He didn't offer any resistance or violence. Nonetheless, he was knocked to the ground, held down, hog tied with a wave of officers on top of him. A lot of other officers stood around and laughed. That is not this case. The Supreme Court case, while in its view, noted in 2015, says that the question of qualified immunity is whether the violative nature of the particular conduct is clearly established, but also that that inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. That's why the Drummond case is not available to the appellate powers. There is no case offered where someone who continues to resist and fight like Mike Abbey did, where he means the force and clearly established the existence. I'd also point out that after Officer Dimitropoulos arrived as a university police officer, that is when they finally got Mike Abbey's legs under control. Up to that point, he was actually kicking Officer Bond with his legs, so the fight was continuing. This wasn't simply about, just get this guy and wrap it up. They're still trying to control the fight. Drummond seems to say to me, and I'm positive about this, Drummond seems to say to me that this hotline is deadly force if they continue to use pressure. It says that Drummond claims that two officers continue to press their weight on his neck and torso as he lay handcuffed on the ground and begged for air. Under similar circumstances in what has come to be known as compression asphyxia, prone and handcuffed individuals in an agitated state have suffocated under the weight of the restraining officers. Was there, when he was hot tied, was there still weight of the officers on him? No, Your Honor. The record reflects that Officer Plaitsch is to the west of Mike Abbey and he's trying to control his arms, and Officer Bond is on the back of his legs in the knee area. And again, no, no, no. D.P. Van Blarek, the police practices expert, says that, oh, this death is consistent with asphyxia. Now, we know, Your Honor, from Billings and V. Smith and more recently the Sheehan case, that the plaintiff can't survive summary judgment just by proffering an expert opinion that casts the police actions into doubt. But wasn't somebody on his shoulders? There may have been a knee on his shoulder, which, again, is reasonable. Now, the drug court, if I may, looks at the case, the case of the state of Phillips, and it's a case under Milwaukee with remarkable similarity to these facts, except for that it was closest to a hotel room. Other than that, it's very similar. And that court found holding a person down in a prone position who continued to fight was reasonable in the record, and then the case reflected that the officer's testimony was that if I wasn't holding him down, he could have gotten up. And again, in this case, it's someone who just threw himself out a window, and I read the officer on his testimony that he's trying to hold him down, he's trying to continue to fight. So you're placing distinction with drama is not the nature of the force necessarily, but his violent nature, right? Yeah, I think that's absolutely a distinguishing factor, Your Honor. It's hard to imagine someone who's handcuffed in a hotel being a danger or a threat to anybody. Perspectively, I would disagree with that, Your Honor. Officer Bond, his testimony was that if he got off of my cabin, he was handcuffed, he might have just run out the door. He was exhibiting superhuman strength. These are two large places. But the question is, once he was hot tied, why was there this need for additional weight? Oh, I don't think there's any evidence that was laid on him after he was hot tied, Your Honor. As soon as the fourth officer arrived, got the ripper strings on, he was finally contained. And the testimony I think of, Officer Peich, is that almost immediately, they noticed that he's not breathing. And almost immediately, they do roll him onto his side and the twice in my statement. These are officers that just fought for more than 10 minutes. They're not necessarily looking at, you know, with every second. I mean, they're trying to recuperate themselves. It looks like I'm almost out of time, Your Honor. If I could just make a closing here. Certainly, there's room in this case to think that if the police officers had done something differently, then maybe Mike and Abby would still be alive. And certainly, the city of Reno sympathizes with someone who lost a loved one. And it was angry with the police. They're looking to hold someone accountable. That's not how a qualified immunity analysis works. Justice Ginsburg wrote that we don't automatically let the jury sit and guess this type of life and death decisions, just because the plaintiff has an expert and a plausible claim that something could have been done differently. We don't automatically sit and guess unless, as a matter of law, the court determines that there was a constitutional violation and that as a matter of law, it was so clearly established that any reasonable officer in that situation would have known that it was unlawful. If reasonably competent officers could disagree on whether this force was appropriate, then immunity must stand to the district court.  Thank you, Your Honor. Thank you. Counsel? Thank you. I think what the city has just conceded is the fact that there are arguments about the matter prior to the incident, prior to the defense issues. And by acknowledging that there is a two-pronged part or a two-faced part of this particular case, they cannot describe the reasonableness of the actions because the officers were not reasonable in their actions under Drummond, and they were not reasonable under any of the cases that led to the positional fix-it in terms of employing the octet. The reason one individual, Rasmus, was the only individual with different restraints that are then trying to prove these incidents and octet the individual is because he supposedly had been certified, but he had never been trained in positional fix-it. He had never been trained in excited delirium. They absolutely did not know what they were doing in terms of dealing with this individual. The testimony is different than what counsel is saying as to what Blanch was doing. You have four very large officers and, my goodness, having a 160-pound small individual. And so you have a situation where they've decided to, either from the figure four, put him in a hog-type situation that compresses the ability to breathe. And it's a situation where there are medical examiners, or Washoe County's medical examiners, one that made the determination that their actions were not reasonable in the sense of a medical situation because they are what caused this individual's death. That's their medical examiner. It's on the death certificate as well as the evaluation done in his autopsy report. So you have a situation where the district court would only do what happened when they talked about him as bouncing off the wall. If there was a situation or option, there is no corollary to that in terms of their offensive use of force in terms of handcuffing him and then sitting on his back in a prone position. That's the key to this particular case. He's left in a prone position even after he was hog-type. Are you saying that they were sitting on his back after he was hog-type? He was, in terms of getting him hog-type, he was in a situation. Hog-type. They're holding him down. Yes, sir. Yes, ma'am. And making that determination that he needed to be in hog-type form even though he was already in a hog-type position. And at that point in time, clearly they were on his back, holding him down, compressing him. And that is a situation that was a very basic premise of drumming. And I would submit that there have been subsequent cases in this district of Nevada that have dealt with these same things. The Marcy case is one. Sanford Tucker is another one that came before the 9th Circuit. These are cases that all dealt with the same type of situation. And they fairly could have flipped him over. That's the key to keeping this man alive and other individuals alive in these situations. And I would submit that based upon that, the city of Rideau is liable under the Menil policy also because he simply did not go with the rest of the nation in recognizing these difficulties and making a determination that their officers were going to be reasonably trained. And based upon the fact that they weren't reasonably trained, we end up with a situation where an individual lost his life. Thank you, counsel. Thank you. Thank you, counsel. We have a very helpful argument on this case. Regardless of the outcome of this case, the court is still insisting that you cede the doses to the Abing family on the loss of your loved ones. We really regret that this circumstance occurred. We will be on recess for 10 minutes to allow telephone communications to be established.
judges: Schroeder, Rawlinson, Drain